Herbert v. Pico Ski Area, No. S1268-00 CnC (Katz, J., June 8, 2004)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT
Chittenden County, ss.:


HERBERT

v.

PICO SKI AREA


ENTRY


      This is a third-party beneficiary case, with an overlay of bankruptcy injunctions and successor-liability. Plaintiffs Herberts ran Pico Mountain Ski Area under a series of successive corporate entities. Electricity was supplied to them throughout by Central Vermont Public Service, CVPS. Eventually, the Herberts sold Pico to Defendant American Skiing, under

elaborate contracts which provided among other things for a $214,802.79 escrow to cover possible "liens, encumbrances or other claims." CVPS, which had billed Pico in the amount of $214,802.79, now seeks these funds to cover bills incurred during the Herberts' operation of Pico. The Herberts oppose CVPS's entry into this case and assert their ownership over the escrow monies. We reject the Herberts' claims based on three areas: res judicata, CVPS' third-party beneficiary status, and the Herberts' lack of ownership in the escrow fund. We note that while each of these lines of reasoning overlap, they also provide independent bases for our conclusion.

## V.R.C.P. 19. Joinder & V.R.C.P. 24. Intervention

Plaintiffs Herberts initiated this suit to compel defendant American Skiing to release an escrow fund totaling $214,802.79 to them. CVPS has made a Rule 24(a) motion to intervene. V.R.C.P. 24. American Skiing in turn has moved to join CVPS as a party because of CVPS's potential right to the money. V.R.C.P. 19(a). American Skiing argues that while it is merely a stakeholder of the money, without a decision that is binding on both the Herberts and CVPS, it might be open to future litigation and inconsistent judgments concerning their duty to execute the escrow fund. We find that this concern satisfies American Skiing's burden of persuasion, advancing a cogent argument as to why CVPS should be joined to the present litigation. Grassy Brook Village, Inc. v. Richard D. Blazej, Inc., 140 Vt. 477, 481–82 (1981). The Herberts' main concern—that joinder would violate the Bankruptcy Court's injunction—has been answered by that court's entry granting CVPS leave to intervene in this case. (CVPS's Am. Mot. for Summ. J., at exs. A, B, Jan. 23, 2003.) That decision clarified that the injunction, which the Herberts claim and CVPS acknowledges, did not end the debt owed to CVPS, or their right to collect it from others, but rather CVPS's right to collect from the Herberts themselves. Id. at ex. A.

Despite the Herberts' arguments to the contrary, the Bankruptcy Court held that the previous injunction did not prevent CVPS from pursuing this escrow fund so long as 1) it has a right to the escrow fund and 2) the funds are not owned by the Herberts.  Id.

To the extent that the Herberts have re-argued the injunction to us, we reject their claims as res judicata.  Lamb v. Geovjian, 165 Vt. 375, 379–80 (1996).  When CVPS sought a declaratory judgment from the Bankruptcy Court concerning the scope of its injunction, the Herberts opposed and asserted their claim to immunity from any suit.  (Herberts' Opp'n to CVPS Mot. to Determine Scope of Inj. & Cross Mot. for Determination that Bankr. Inj. Prohibits CVPS from Gaining Access to the Herberts' Funds Held in Escrow, Jul. 16, 2002.)  Thus, the Bankruptcy Court considered whether or not this present case was a violation of the injunction, and by extension the immunity it granted to the Herberts.  Notwithstanding its somewhat equivocal language about who owns the escrow fund, the Bankruptcy Court's decision implicitly rejects the Herberts' claim of ownership.  (CVPS's Am. Mot. for Summ. J., at exs. A, Jan. 23, 2003.)  Immunity, after all, means freedom not only from adverse judgments but from further litigation entirely.  Right or wrong, by refusing to grant such immunity the Bankruptcy Court has ruled the escrow funds outside the realm of the Herberts' immunity.  The sole decision remaining for us, then, is whether CVPS or another party has a right to this money.  To argue that the fund is the Herberts' property would challenge the Bankruptcy Court's interpretation as to the scope of its prior injunction and would amount to a collateral attack on this issue.  See Trahan v. Trahan, 2003 VT 100, at ¶ 11 (re-litigation of issues covered by family court order was an impermissible collateral attack).  In other words, by allowing the intervention of CVPS and refusing to grant immunity, the Bankruptcy Court found that the escrow fund did not belong to the Herberts.

While this is not the only basis for our decision, as we will discuss below, we conclude the Bankruptcy Court's decision is preclusive on this matter. Therefore, in the interest of avoiding inconsistent judgments, we will adhere to that decision that the escrow fund does not fall under the Herbert's sphere of immunity and by implication lies outside their control and ownership. We also order CVPS joined as a party to the present case.

### Contract for Sale of Pico Mountain

CVPS makes a detailed argument suggesting that the Herberts "stripped" their successor corporate entities of assets, while continuing to run up electric bills which were never paid. So when they sold their rights to Pico, there were no means of paying off the unsecured trade creditors. Nevertheless, both American Skiing and the Herberts seem to have been aware that those creditors might not view things with quite the same sangfroid. So the contract they reached contains two key provisions:

¶ 4.02 <u>Purchase Price Adjustment</u>

(a)  The Purchase Price payable to [Herberts] shall be reduced on a dollar-for-dollar basis by the amount necessary to deliver free, clear and unencumbered title to all Purchased Assets. Initially, the adjustment will be made by deducting such amounts from cash payable at Closing to reflect amounts paid, incurred or required to discharge all liens and encumbrances, and satisfy all liabilities that have been identified as of the Closing Date which could mature or otherwise be perfected into or result in the establishment of a lien or encumbrance upon, or a claim to or against any of the Purchased Assets, or a claim against Buyer as the owner of the Purchased Assets.

*    *    *

(c)    Buyer agrees to establish at Closing, and maintain in a segregated account, an escrow to fund the liens, encumbrances and other liabilities identified in Schedule 4.02.  Sellers shall be afforded an opportunity to resolve any and all disputes with respect to the liens, encumbrances and other liabilities identified in Schedule 4.02; provided, however, that Buyer reserves the right to apply the escrowed proceeds to pay such claims and receive a discharge of any such liens, encumbrances or other liabilities at any time, and in any manner, buyer deems appropriate, in buyer's sole discretion, in order to preserve and protect its property interest in the Purchased Assets.  Sellers may not act for or on behalf of Buyer in attempting to resolve such disputes or claims, but rather shall contest, dispute or resolve such claims at Sellers' sole cost and expense and in Sellers' name. Nothing set forth herein shall in any way prevent, prohibit or restrict Buyer from taking any action, or refraining from any action Buyer deems necessary or appropriate to defend, protect or advance its interests with respect to such claims, whether or not consistent with Sellers' position as to such matters.

*    *    *

## ¶4.05 <u>Adjustment for Utilities</u>

Sellers shall cause all meters for electricity, gas, water, sewer and other utility usage related to the Purchased Assets to be read on the Closing Date, and Sellers shall pay all charges for such utilities which have accrued on or prior to the Closing Date.  If the utility companies are unable or refuse to read the meters on the Closing Date, all charges for such utilities to the extent unpaid shall be prorated and adjusted as of the Closing Date based on the most recent bills therefor.  The Sellers shall provide notice to Buyer within three days before the Closing Date setting forth (i) whether utility meters will be read as of the Closing Date and (ii) a copy of the most recent bill for any utility charges which are to be prorated and adjusted as of the closing Date.  If the meters cannot be read

as of the closing Date and, therefore, the most recent bill is used to prorate and adjust as of the closing Date, then to the extent that the amount of such prior bill proves to be more or less than the actual charges for the period in question, a further adjustment shall be made after the Closing Date as soon as the actual charges for such utilities are available, which Buyer shall have read as soon as possible after the closing Date. Sellers' and Buyer's obligation to make such post-Closing Date adjustments for utilities shall survive the Closing. Sellers' obligations hereunder not funded separately by Sellers at Closing shall be deducted from cash payable to Sellers at Closing.

(Pl. Opp'n to CVPS's Am. Mot. for Summ. J., at ex. B, Dec. 8, 2003.)

After reaching these contract terms, the parties determined to escrow the amount of $214,802.79, as shown on the "Closing Statement" executed by the parties December 9, 1996, the date on which American Skiing purchased the Pico assets. (CVPS's Am. Mot. for Summ. J., at ex. H, Jan. 23, 2003.) This sum is listed under "Section 4.02(c) Reservations," an obvious reference to the previously cited contract provisions. $214,802.79 happens to be the amount of the bill presented by CVPS. (See Pl. Opp'n to CVPS's Am. Mot. for Summ. J., at ex. D, Dec. 8, 2003.)

Here, the Herberts argue that there was a "proration duty" under 4.05, which was their only duty. Proration, however, exists only in the event that the utilities could not read their respective meters and was a short-term means of setting aside money for the payment of utility bills. The record before us does not even permit the suggestion that the precondition for proration ever occurred—an inability or refusal to read the meters.

On the other hand, certain legal conclusions seem inescapable from the quoted provisions 4.02 and 4.05. First, this was an integrated contract,

drafted with great care, between sophisticated parties each represented by counsel. See Restatement (Second) of Contracts § 209 (1981); 17A Am. Jur. 2d Contracts § 396 (discussing integrated contracts and its effect on interpretation). Second, American Skiing transparently determined that it expected the electricity bill of its predecessor to be paid as of the Closing Date. It may be argued about whether American Skiing actually would have suffered successor liability, or whether CVPS had any right to impose a lien. Either proposition may be argued. But neither proposition need be decided.

This is a contract case, and the contract of these parties must be interpreted and applied, so that the objectively expressed contractual intent will govern. Restatement (Second) of Contracts § 212 cmt. a (1981). American Skiing was buying Pico; it did not intend to buy lawsuits. Even ill-founded lawsuits, which it might eventually win. Cf. 3 S. Williston & R. Lord, A Treatise on the Law of Contracts § 7:45, at 701 (4th ed., 1992) ("Forbearance to prosecute or defend a suit or other action which has been or may be instituted is generally held sufficient consideration without inquiring whether the suit or the defense would have been successful or not."). Moreover, in entering on the Pico premises, American Skiing obviously understood that it would be opening an account with the only supplier of electricity, CVPS, and reasonably wanted to do so under favorable terms. American Skiing did not want to deal with a utility which had just been burned for almost a quarter million dollars, and therefore announced to the successor ski operator that it wanted some huge deposit, in order to open the new account. How much better to be dealing with some CVPS manager on the basis of a paid bill, or at least one secured by escrowed funds, required by American Skiing's contract. Although American Skiing's particular intent, at the time, may not be part of the record, its purposes are easily divined from the contractual language and

are clear and not at all surprising in the context of everyday business. Isbrandtsen v. North Branch Corp., 150 Vt. 575, 578 (1988). Courts interpreting contracts need not naively blind themselves to the reality of commerce. Id. (citing Restatement (Second) of Contracts § 212 cmt. b (1981)).

## Third-Party Beneficiary Status

From the contract and the closing statement, it is plain that a certain amount of the money was escrowed at the closing to cover outstanding debts whose creditors might have a perfected interest, lien, or claim against American Skiing. CVPS's bill for electricity was one of those debts listed. As we have discussed, it was in American Skiing's interest to include CVPS because any claims by CVPS, regardless of their validity, would have been an unwanted hassle to American Skiing and had the potential to harm its on-going business relationship with CVPS. It was the intent of American Skiing and the Herberts, then, to provide a pay off, or benefit, to parties such as CVPS, who were creditors of the Herberts. In other words, CVPS and other creditors listed under the ¶ 4.02 closing sheet were third-party beneficiaries to the contract because they were the intended recipients of escrow funds necessary to satisfy the Herbert's debt. Morrisville Lumber Co. v. Okcuoglu, 148 Vt. 180, 184 (1987) (parties' contemplated satisfaction of a debt to another is the essence of a third-party beneficiary contract). This is acknowledged implicitly by American Skiing when it notes that "[i]n the absence of the bankruptcy proceeding there would be no question that the money could be turned over to CVPS." (Def. Resp. to CVPS's Am. Mot. for Summ. J., at 2, Jul. 1, 2003.) (notwithstanding prior blanket assertions by American Skiing to the contrary).

The question raised by the Herberts is whether CVPS still has a

claim to this escrow money since the Bankruptcy Court's 1997 Injunction has ended any liability of the Herberts. According to them, CVPS has neither claim nor right to this money because the injunction extinguished the debt and blocks CVPS from going after any of the Herbert's assets. The problem with this argument, however, is that it is premised on two conceptual fallacies. First, the debt that the Herberts and their companies once carried prior to bankruptcy has not been dissolved by the bankruptcy injunction. As the Bankruptcy Court made clear in its order allowing CVPS to intervene in this case, the injunction has only barred CVPS from ever seeking payment from the Herberts, personally. (CVPS's Am. Mot. for Summ. J., at ex. A, Jan. 23, 2003.) The debt owed to CVPS's still remains. Thus, CVPS is still free to pursue this claim against other parties or other sources. See 11 U.S.C. § 524(e) (outlining the effects of a discharge from a bankruptcy); Terwilliger v. Terwilliger, 206 F.3d 240, 247 (2d Cir. 2000) (noting that a barnkruptcy injunction works as an affirmative defense only for the party it covers); see also Adamson v. Dodge, 174 Vt. 311, 315–16 (2002) (noting that former spouse that had her name on the other's credit card account was liable for the debt following his bankruptcy and subsequent injunctive protection). Conceptually, CVPS's debt from the electricity supplied to Pico remains, and it has a right to pursue any asset outside of the Herberts' protected sphere.

The second concept that the Herberts rely upon concerns the ownership of the escrow account. According to them, they own the escrow account so that even if CVPS could still pursue its debt, it could not touch the escrow because it is their asset. This mischaracterizes the nature of the escrow account and the type of action CVPS is pursuing. Ownership over an escrow fund is contingent on fulfilling the conditions of escrow. In re Mushroom Transportation, Co., 282 B.R. 805, 817 (E.D. Pa. 2002). Legal title to the res of the escrow, whether property or money, does not pass

from the grantor to the grantee until the condition of the escrow has been satisfied. 28 Am. Jur. 2d Escrow § 17. The grantees in this case are the Herberts who have a contingent right to any remaining escrow funds after the CVPS debt has been satisfied. The question of whether this contingent right is enough to establish ownership has been addressed by jurisdictions in other contexts. See H. Warren., Who Must Bear Loss Resulting from Defaults or Peculations of Escrow Holder, 15 A.L.R. 2d 870 (1951, Supp. 2004) (citing to cases that ownership and risk of loss do not shift to grantee until after the conditions for the escrow are met). Most have held that ownership does not pass until the condition of the escrow is met or fails. Id. In particular, bankruptcy courts have considered escrow funds to be outside the bankruptcy estate. While the focus in such situations has been primarily on debtor–grantors who contribute to an escrow prior to bankruptcy, the courts have, short of fraud, refused to include the escrow contributions in the estate because even though the debtor holds legal title, it is contingent on whether the conditions of the escrow are met. P. Mears, Can a Bankruptcy Trump an Escrow?: A Primer on Enforceability, 6–Oct. Bus. L. Today 40, 42 (1996); see also T. Byrne, Escrows and Bankruptcy, 48 Bus. L. 761 (1993). Hence, the Herberts' sole claim of ownership here is an equitable title, contingent on the satisfaction of CVPS's electrical bill. We are persuaded that this contingent right does not create a right of ownership in the Herberts and leaves the escrow fund outside of their control and ownership and, therefore, outside the protection of the bankruptcy court's injunction. (Cf. CVPS's Am. Mot. for Summ. J., at exs. A, B, Jan. 23, 2003.)

As the third-party beneficiary of the escrow fund provisions in the sale contract, CVPS has the best claim on the escrow funds and is eligible to claim them. In essence, the nature of CVPS's claim is for the money in

escrow alone.  It is not a claim against the Herberts or their estate.  It is rather essentially an in rem claim against a discrete fund, presumably including the interest it has earned.  CVPS will not receive, nor does it seek, a personal judgment against the Herberts, but a declaration that the stakeholder must pay over the res.  In this respect, our conclusion that CVPS has a right to the escrow funds has nothing to do with the law of bankruptcy or the judgments of the Bankruptcy Court.  It is instead a simple contract interpretation, which establishes third-party beneficiary CVPS's right to funds that were segregated through contract.

Based on the foregoing, CVPS's motion to intervene and motion for summary judgment are granted.

Dated at Burlington, Vermont_____, 2004.

_____
Judge